Leonard E. Rtjisi, J.
The probation officer has made a request and recommendation that the child Barry Winter* be committed to an agency for placement in a home for adoption on the ground that the moral and temporal interests of such child require that the respondent be permanently deprived of the custody of such child and that such adoption would be in the best interests of such child. . '
*1047 The mother came in before me on October 27,1958, and I have conducted hearings thereon to the present date. The respondent mother is represented by counsel who has participated in such hearings and has had reasonable opportunity to examine the witnesses and parties as well as the case history and psychiatric reports of all parties concerned. He has examined and cross-examined the witnesses and has been given the opportunity to produce all evidence which he or his co-counsel deemed material and pertinent to the issues.
On all of the proof adduced before me I find by a fair preponderance of the credible evidence the following:
The respondent, Jeanette Hall*, also known as Jeanette Winter*, is the mother of Leslie Karen, born on January 8, 1945, at the Brooklyn Jewish Hospital, Brooklyn, New York. Its father’s identity was given as Shay Rubin*, later changed by the mother as Shae Winter*. His whereabouts are unknown although the mother states he was last known to live in the State of New Jersey.
The child Carolyn was born to the respondent on October 20,1946, at the Brooklyn Jewish Hospital, Brooklyn, New York. The father was a Navy officer whose name is unknown except by the first name of ‘ ‘ Dick ” or “ Robert ’ ’, and his whereabouts are unknown.
The child Barry was born at the Brooklyn Jewish Hospital, Brooklyn, New York on October 23, 1953. Its father’s name given at that time was Joseph Moore* and changed at the hearing of October 27, 1958 to Albert Scotto* a friend of Joseph Moore*, of Washington, D. C. His whereabouts are unknown.
The petition charging the respondent mother with the neglect of these children was verified on August 3, 1954, and a finding that these children were neglected children was duly ordered and adjudged by Mr. Justice Jacob Panken on August 3, 1954.
None of these children has ever lived with the mother, but each was placed immediately after his or her birth at the Infants Home of Brooklyn, and the Infants Home at Par Rockaway, Queens, New York.
None of the fathers of these children nor the respondent has ever contributed to their support.
The respondent gave birth to another child — Nerissa Jessica on October 4, 1957. Its father is one Bob or Robert Hamilton* of Missouri (true name given held confidential). He is now supporting the respondent and the child by direct payment of *1048 $300 a month. This child lives with the mother and is not included in this proceeding.
All of these children were born out of wedlock.
The respondent has refused to establish a home for these children in spite of the requests, direction and planning of the probation staff for the children. She has refused to keep appointments and resisted foster home planning. She has consistently failed and refused to comply with rules of visitation, conduct and behavior. On some occasions she has requested the return of the children to her home, but has vacillated repeatedly by countering these requests by refusing to plan and prepare for their return. She has been most unco-operative with the agencies in their planning for the readjustment of her home. She has been examined psychiatrically and has refused and resisted psychotherapy in order to enable her to adjust to the needs of the children. Although quite co-operative and pleasing in some interviews and in her promises at times, this has been immediately followed by refusals and resistance immediately thereafter. Her contacts with the children have been so upsetting to their lives that such visits had to be curtailed and eventually suspended. This conduct and behavior was the basis of the original finding of neglect on August 3, 1954, and has continued to the present date. It is the conclusion of the court that the conduct, demeanor, resistance and ineffectiveness is virtual and complete abandonment of these children. The children in turn have been so emotionally traumatized that Leslie Karen now 14 years of age and Carolyn now 12 years of age refuse to see or talk to their mother. All of this is due to her conduct, demeanor and neglect.
The question before the court is whether the child Barry should be permitted to continue in the path of his sisters Leslie Karen and Carolyn, or whether he is to be given the opportunity of a normal family life with good, decent, loving parents. Does the right of parenthood transcend beyond the right of Barry to lead a normal life or is Barry to be made the pawn of her whims and wiles and his life to be twisted and turned to suit the mother’s indolence, procrastination and failure?
Is it not the duty of the court to protect this child and if possible, to provide and give him the opportunity to live a normal life in a normal home with a mother and father figure to give him love and affection, family ties and stabilizing influences as against the confusion and trouble of a rejecting ineffectual mother? The needs of this child require permanent placement if he is to grow and mature. This cannot be had in institutional placement or in a temporary foster home.
*1049 I have been troubled by the possible trauma of the child’s knowledge of the existence of his two half sisters, Leslie Karen and Carolyn, with whom he has not visited since February of 1958.
Here the problem is twofold, and is answered in the communication of the Jewish Child Care Association of New York letter of November 12, 1958, signed by Mrs. Gladys Weinberg, supervisor. I quote:
Barry’s knowledge of Ms sisters and theirs of him is an intellectual not an experiential awareness. Barry and his sisters never lived together. They have seen each other 6 or 7 times in all. Their first visit was in June, 1955 and Mrs. Winter* and her mother participated in the visit. Barry saw Ms mother, grandmother, and sisters together only once again, early in 1956. Since then, Mrs. Winter* has not participated in Barry’s visits with his sisters. Barry’s last visit with his sisters were in February and May of 1958.
The question of Barry’s adoption has been discussed with the girls, and the sense of the discussion relayed to us by Miss Schwartz, their worker. Miss Schwartz feels that the girls react to the question of adoption for Barry with a further awareness of their own lack of meaningful identification; for Carolyn particularly, the step forward in thoughtful evaluation of what choices she might have in future life, the meaning and possible value of foster home placement for her, has come to the fore very positively. This does not mean that there is no trauma for the girls, but it is not the trauma of loss of a sibling. The question was discussed with our psychiatrist, Dr. Hans Cohn, also. He thought that trauma is a part of living and that the evaluation should be in terms of whether the girls use it toward future growth.
However, since it is not possible to prognosticate just what meaning the fact of having a brother will have for the girls as they become older, and the fact of having sisters may have for Barry even though he is adopted, in placing Barry in an adoptive home, the adoptive parents would know that there are sisters and that if at some time when Barry reaches the age of discretion he should want to know about family, the adoptive parents agree to contact our agency for pertinent information.
I am fully aware of tbe sacred rights of tbe parent mother to her children. This mother however has not acted as a real mother. She has withheld from Barry her physical presence, her care and his opportunity to display filial affection. She has neglected to train and supervise his growth and development and has neglected and refused to perform her natural and legal obligation. She has foregone her parental duties and responsibilities. She has forfeited her natural rights to custody.
The Legislature by an act to amend the Domestic Relations Court Act of the City of New York added subdivision (24) to section 2, which reads as follows: “(24) ‘Permanently neglected child ’ means a child whose parent or guardian has, following the placement or commitment of such child in the care of an authorized agency, whether in an institution or in a foster home, and notwithstanding the diligent efforts of such *1050 agency to encourage and strengthen the parental relationship, so failed substantially and continuously or repeatedly, for a period of more than one year, to maintain contact with and plan for the future of the child, although physically and financially able to do so, that such parent or guardian should, in the moral and temporal interest of such child, be deprived permanently of the custody of the child, and, in the event that the parent defaults after due notice of a proceeding to determine such neglect, such physical and financial ability of such parent may be presumed by the court.” (L. 1959, ch. 449, § 2, eff. April 15, 1959.)
Pursuant to such provision and any other provision of the law made and provided, I hereby
order and adjudge that the said child, Barry Winter*, born on October 23, 1953, to one Jeanette Hall*, also known as Jeanette Winter*, the respondent herein, to be a permanently neglected child, and I hereby further
order that, in the moral and temporal interest of such child, Barry Winter*, the said Jeanette Hall*, also known as Jeanette Winter*, be deprived permanently of the custody of such child; and I hereby further
order, that the said child, Barry Winter*, be and he hereby is committed to the Jewish Child Care Association of New York, and that the Jewish Child Care Association of New York place the said child in a home for the purpose of adoption as expeditiously as possible, and that upon compliance with the provisions of law made and provided, application be made for such adoption to the Surrogate of the county having jurisdiction therein upon proper notice to the respondent mother in such proceeding as required by law.
The children Leslie Karen and Carolyn are continued on remand as heretofore to November 17, 1959.
All motions and requests are hereby granted or denied in accordance with the within order.
Send copies to respondent, respondent’s attorney, Jewish Child Care Association of New York, and Hartman-Homecrest Home for Children.

 Asterisks throughout this opinion indicate that names are fictitious for the purposes of publication.